# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **HAROLD E. COLLINS,** ) <br> ) <br>     Plaintiff and Counterclaim ) <br>     Defendant, ) <br> ) <br>     v. ) <br> ) <br> **UNITED STATES OF AMERICA,** ) <br> ) <br>     Defendants and ) <br>     Counterclaim Plaintiff, ) <br> ) <br>     v. ) <br> ) <br> **MICHAEL L. BAKER, VIJAY K. GUPTA,** ) <br> **THOMAS MCDERMOTT, ALFRED SHARP,** ) <br> **LEROY WRIGHT, and JEFFREY YESSENOW** ) <br> ) <br>     Counterclaim Defendants. ) <br> --------------------------------- ) <br> ) <br> **JEFFREY YESSENOW,** ) <br> ) <br>     Counterclaim Plaintiff, ) <br> ) <br>     v. ) <br> ) <br> **UNITED STATES OF AMERICA,** ) <br> ) <br>     Counterclaim Defendant. ) | No. 10 C 6705 |

## MEMORANDUM OPINION AND ORDER

This case began as a lawsuit filed by Harold Collins against the United States of America ("the government") for erroneous or illegal assessment or collection of tax. The government filed a counterclaim against Thomas McDermott, among others, alleging that

the counterclaim defendants were liable for an unpaid federal tax assessment attributable to the counterclaim defendants' failure to pay over to the Internal Revenue Service ("IRS") the trust fund portion of income taxes and Federal Insurance Contribution Act ("FICA") taxes that had been withheld from wages paid to the employees of Heartland Memorial Hospital ("Heartland") during the second and third quarters of 2005. McDermott and the government filed cross-motions for summary judgment. For the reasons set forth below, McDermott's motion is denied and the government's motion is granted.[1]

I.

McDermott first became involved with Heartland when he was hired as a consultant in 2003. Beginning in March 2004, McDermott made a series of loans to Heartland, eventually totaling around $3 million. McDermott also asked Neil Fribley, a personal friend, to work on financial issues for Heartland and Heartland agreed to take on Fribley. On March 17, 2004, Fribley was confirmed as vice president of finance and real estate development and McDermott was elected to the board of directors. In the summer of 2004, Heartland hired McDermott and Fribley as consultants to work on Heartland's financial activities relating to day-to-day operations

---

[1] The government's unopposed motion to withdraw admission is also granted.

and on the reorganization of Heartland's accounting department and revenue cycle management. According to Fribley, he and McDermott were in daily communication about, among other things, financial issues, including payment of bills.

On June 9, 2004, McDermott was named chairman of the executive committee. The committee had the primary responsibility for handling day-to-day business transactions, including payment of payroll and related tax liabilities. Along with the establishment of the executive committee, Heartland established a policy requiring that all transactions over $10,000 be approved by McDermott.

On August 18, 2004, the Heartland board approved a sale-leaseback transaction in which Heartland was to sell its hospital building to Munster Medical Holdings ("MMH") and lease the building back. McDermott and Fribley were each 50% co-owners of MMH, and after the transaction closed McDermott remained the largest shareholder. At the same board meeting, the board approved new consulting contracts for McDermott and Fribley. Though Heartland made some payments to MMH, MMH sent Heartland a notice of default on June 13, 2005. Later that month MMH and Heartland reached a forbearance agreement rescinding the notice of default, though McDermott refused to sign the agreement. From July through October, after the forbearance agreement was executed, Heartland

paid significantly more rent to MMH than it had during the first half of 2005.

At the start of 2005, Michael Baker was hired as Chief Operating Officer of Heartland, and during his interview, Baker was advised that McDermott was not to be trusted. After Baker was hired, McDermott's relationship with Heartland began to turn sour. He and Fribley were removed from the executive management committee on March 5, 2005, though McDermott continued to serve as a board member after that date. McDermott also continued to serve on the executive management committee of Heartland's Merrillville location, where he maintained an office. McDermott retained check-signing authority, along with other board members, on behalf of Heartland. During the second and third quarters of 2005, McDermott signed 4,327 checks totaling over $8 million. These check included at least three checks to himself for $50,000; $20,000; and $25,000. McDermott also signed at least four checks to MMH, each for amounts between $100,000 and $298,723.

McDermott continued to have other responsibilities at Heartland. In April 2005, McDermott was included in correspondence regarding Heartland operations that other board members did not receive. He was re-elected to the board of directors in August 2005, and at a joint shareholders and members meeting in September 2005, he was identified as a resource for staff regarding administrative concerns. In an August 18, 2005, news article,

McDermott was quoted commenting on the financial status of Heartland. And when Heartland was acquired by Wright Capital Partners ("Wright") in September 2005, McDermott was announced as the president of the post-acquisition company. As a result of the acquisition, McDermott received approximately $143,000 of the proceeds from the sale of the hospital building. Ultimately, though, McDermott declined to serve as president of the new company and resigned as officer, director, and consultant in December 2005.

McDermott was aware of the unpaid payroll taxes, and on July, 2005, attended a board meeting at which the board established payroll and taxes as the top priority for "cash payments." McDermott claimed that he was assured that the payroll taxes would be paid in full after Wright acquired Heartland. However, McDermott never asked for a check to be cut to pay the payroll taxes, and during the relevant periods he continued to sign checks to pay other creditors after he was aware that the payroll taxes were not being paid. The issue of the unpaid payroll taxes was also discussed at a meeting held at McDermott's home between June and October of 2005. Additionally, board members were presented with financial statements showing unpaid payroll taxes. Fred Smith, Heartland's comptroller, resigned on August 22, 2005, citing the unpaid payroll taxes as one of the reasons.

II.

A court may grant summary judgment only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If it does so, to survive a motion for summary judgment, the non-moving party must come forward with specific facts establishing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On summary judgment "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (internal quotation marks and citation omitted). The existence of "a mere scintilla of evidence" is insufficient to stave off summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The Internal Revenue Code ("I.R.C.") requires employers to withhold income taxes, FICA taxes, and medicare taxes from the wages of employees. I.R.C. §§ 3102(a), 3402(a). Employers hold the collected taxes in trust for the United States and must pay them over to the IRS quarterly. *See United States v. Kim*, 111 F.3d

1351, 1356. Under I.R.C. § 6672, every responsible person who willfully fails to collect, account for, or pay over the withheld taxes may be held personally responsible for any unpaid amount. "Once the government presents an assessment of liability, the taxpayer bears the burdens of production and persuasion." *Ruth v. United States*, 823 F.2d 1091, 1093 (7th Cir. 1987).

## III.

As an initial matter, I must note that McDermott did not comply with Local Rule 56.1 with respect to either motion for summary judgment. Rule 56.1 requires a party opposing a motion for summary judgment to file "a concise response to the movant's statement that shall contain . . . a response to each numbered paragraph in the moving party's statement." L.R. 56.1(b)(3). In addition, Rule 56.1 provides that "[i]f additional material facts are submitted by the opposing party . . . the moving party may submit a concise reply in the form prescribed in that section for a response. All material facts set forth in the statement filed pursuant to section (b)(3)(C) will be deemed admitted unless controverted by the statement of the moving party." L.R. 56.1(a). First, McDermott did not sufficiently reply to the government's statement of facts and instead filed excerpts from the deposition testimony of four individuals and purported to incorporate his own statement of facts filed in support of his motion for summary

judgment.  McDermott also laid out his own version of the facts in his memorandum in response to the government's motion.  This is insufficient to comply with the Rule 56.1.  To the extent that McDermott's statement of facts submitted in support of his own motion for summary judgment are supported by the record evidence and conflict with the government's statement of facts submitted in support of its motion, I have considered McDermott to have disputed the government's statement of fact.  Similarly, where a dispute has been raised in the "facts" section of McDermott's response memorandum, and it is supported, I have interpreted McDermott to have denied the government's statement.  However, where a dispute was not apparent from McDermott's statement of facts, I have deemed the government's statements of fact admitted.  Additionally, McDermott did not respond to the government's statement of additional facts filed in opposition to McDermott's motion for summary judgment.  I have deemed admitted the government's statement of additional facts where those facts are supported by the record.

A. Responsible Person

A party is a "responsible person" for purposes of § 6672 if he has "significant control or authority over an enterprise's finances or general decision-making."  *Ruth*, 823 F.2d at 1094.  "Having significant control does not mean having exclusive control over the

disbursal of funds or the final say over whether taxes or bills are paid." *Thomas v. United States*, 41 F.3d 1109, 1113 (7th Cir. 1994) (citing *Bowlen v. United States*, 956 F.2d 723, 728 (7th Cir. 1992)). Analysis of a taxpayer's responsibility "focuses on whether the taxpayer could have impeded the flow of business to the extent necessary to prevent the corporation from squandering the taxes it withheld from its employees." *Id.* "Indicia of 'responsible person' status include: holding corporate office, owning stock in the company, serving on the board of directors, possessing authority to sign checks, and control over corporate financial affairs." *Kim*, 111 F.3d at 1362-63 (7th Cir. 1997) (citations omitted).

McDermott meets four of the five indicia of a responsible person enumerated in *Kim* (he did not hold corporate office during the relevant time period), strongly suggesting that he was a responsible person. He owned stock in the company, served on the board of directors, possessed authority to sign or co-sign checks, and had significant control over corporate affairs. McDermott protests that he was not involved in the day-to-day affairs of Heartland and that his role within the organization was so diminished after he was removed from the executive management committee in March 2005 that he had no influence over Heartland's financial decisions or priorities. The record evidence belies these arguments. In addition to the stock McDermott owned, he had

9

a significant financial stake in Heartland, as a major lender and, through MMH, Heartland's landlord.  McDermott had authority to sign or co-sign checks and this was an authority that he exercised on behalf of Heartland.  It is undisputed that he signed over 4,000 checks, totaling more than $8 million, during the second and third quarters of 2005.  Not only did McDermott sign checks to other creditors, he signed checks to himself and to MMH, of which he was the largest owner.  McDermott may not have had the power to stop the flow of business entirely, but the undisputed evidence demonstrates that he unquestionably had the power to impede it. Further, the power play between MMH and Heartland indicates that McDermott had significant control over Heartland's finances.  The letter of default MMH sent to Heartland during the relevant time period and the subsequent forbearance agreement ensured that Heartland kept paying rent to MMH, and indirectly to McDermott, even at a time when Heartland was not paying its payroll taxes. McDermott's refusal to sign the forbearance agreement is further indication of the power struggle over the priority of rent payments to MMH.  Finally, it is undisputed that at the end of the third quarter of 2005, McDermott was announced as the president of the new company to be formed after Heartland's acquisition by Wright. Though McDermott claims that he had been stripped of all power after March 2005, he remained significantly involved in Heartland's financial and general decision-making.

Because the undisputed evidence shows that McDermott exercised significant control over Heartland's finances, I conclude that McDermott had sufficient authority to prevent Heartland from squandering the withheld taxes. As such, McDermott is a "responsible person" for purposes of I.R.C. § 6672.

B. Willfulness

A responsible person acts willfully in failing to remit withheld taxes "if he pays other creditors after he knows of the employer's failure to pay the withheld funds to the government." *Thomas*, 41 F.3d at 1114 (citing *Garsky v. United States*, 600 F.2d 86, 91 (7th Cir. 1979)). "Willful in this civil context does not mean possessing a specific fraudulent intent or evil motive." *Id.* (citations omitted). Instead, a "responsible person" is liable if he "(1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily." *Wright v. United States*, 809 F.2d 425, at 427 (7th Cir. 1987).

McDermott does not raise a colorable argument on the issue of willfulness. In fact, McDermott does not dispute that he knew during the summer of 2005 that the withheld taxes were not being paid. He also does not dispute that during the same time period, he continued to sign checks to other creditors, including himself and MMH. The uncontested facts therefore demonstrate that

11

McDermott knew that Heartland was withholding taxes and not remitting them to the IRS but instead using the funds to pay other creditors.  As a result, McDermott is a responsible person who acted willfully in failing to pay withheld taxes to the IRS.

IV.

For the foregoing reasons, McDermott's motion for summary judgment is denied and the government's cross-motion is granted. Judgment is entered for the United States and against Thomas McDermott.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: September 12, 2012